Union Bank of Chicago, Administrator of the Estate of Raffaele Rosengolno, Deceased, Appellee, v. Chicago and North Western Railway Company, Appellant.

Gen. No. 35,703.

Opinion filed October 4, 1932.

Nelson J. Wilcox and I. C. Belden, for appellant.

Irving G. Zazove and Rocco De Stefano, for appellee.

Mr. Justice Scanlan delivered the opinion of the court.

This was a suit by the administrator of the estate of Raffaele Rosengolno, deceased, brought under the Federal Employers' Liability Act, Cahill's St. ch. 114, ¶ 321 *et seq.*, to recover damages for the death of the deceased, alleged to have been caused, while he was in the employ of the defendant, by the negligence of certain employees of the defendant. A verdict was returned in favor of the plaintiff and damages were assessed at the sum of $10,000. Judgment was entered on the verdict.

The amended declaration consisted of six counts, but counts three, four, five and six were stricken during the trial. Count one alleges, in substance, that the deceased was in the employ of the defendant as a track walker and that while he was engaged in tightening bolts on a switch track the defendant negligently operated and ran a train against him and thereby killed him. Count two alleges that defendant negligently failed to ring a bell or blow a whistle or give some other warning to the deceased of the approach of the train.

The accident happened in the "passenger terminal yard" of the defendant, north of its main passenger station in Chicago. This yard is elevated above the streets of the city and is used for passenger trains only. No one but employees of the company has a right to be in it. It contains many tracks and an elaborate signal system. The deceased, whose customary work in the yard was that of a section laborer, was substituting for a regular track walker at the time he was killed. He had done all kinds of track work, "including the work of inspecting and walking track."

"The duties of a track walker are inspecting the track, tightening bolts, cleaning coal or anything he might find along the track, gauging tracks. Besides that he does work oiling switches. At the time of the accident he had two track wrenches, a spike maul and a monkey wrench. A track inspector uses a monkey wrench if the bolt is turning, to hold the bolt. . . . If he finds anything wrong he had to report it to his foreman, but the work that he himself would do was these little simple jobs . . . tapping down the spikes and the tightening of the bolts. . . . The track walker's job is not much different, so far as those simple things are concerned than that of an ordinary section laborer." On October 23, 1930, the deceased started to work from the tool shop with a section crew, consisting of ten men, at 8 a. m. The foreman and two of the men then went some distance away on a particular errand, six of the men went to another place to do gang work on a track, while the deceased started to perform the work of a track walker, i. e., walking along the various tracks in the section, tapping down loose spikes, tightening loose bolts, etc. He had been at work for two hours and a half, walking from one place to another, when he was struck and killed by a "regular daily northbound passenger train of the defendant known as the Viking," which had just left the passenger station. The deceased had been working steadily in the yard for the six months prior to the accident, and he had also worked there for six months in the previous year doing the same kind of work and under the same foreman. He had also worked for the defendant as a section hand at Desplaines. Together with other employees, he had been often instructed to watch out for trains and to be careful not to be hit by them. There was a brass bell on the engine in question, which was rung by automatic air. It had been set in motion in the train shed at the depot and was ringing at the time of the accident and as the train ap-

proached the place in question. There are 16 parallel tracks in the train shed at the depot, but at the place of the accident these tracks are reduced, by means of crossovers, to eight tracks. There were 612 regular passenger train movements in the yard daily. "In this yard, it is a fact that a train or train movement might be expected over any one of these tracks at any time." Every five to ten minutes of the day, "some kind of a train, that is, an engine with some coaches," would pass over the crossover upon which or near which the deceased was at the time that he was struck. This crossover is 300 feet long and, from its south end, where the train entered it, to its north end, it curves to the left.

Saska, the fireman of the Viking, appears to have been the only eyewitness of the accident. *He was called by the plaintiff as a witness.* He testified that the Viking left the terminal at 10:30 a. m., its schedule time; that he was on the left side of the cab, firing the engine, etc.; that there was a cord over his head by which he could manipulate the engine whistle; that after leaving the terminal he put in several scoops of coal and then got up on his seat box "to ride over the interlocking plant"; that he first observed the deceased when the latter was about 100 feet in front of the engine; that the engine was just then crossing over from track three to track one in a northwesterly direction and the train was going about 15 miles an hour; that "when I first saw him the man was stooping over. He had his right arm extended towards the train; that is, his right side was towards the train, towards our engine, as we approached him. . . . It seems to me that the man was working about that position (indicating), about four feet from the edge of the fourth tie, to the left of the tie. As near as I can tell he was about four feet away from the track. When I first saw him, he was absolutely clear and out of danger; he was not on the track at all or near it; that is

right. When I first observed him was about 100 feet, and I looked at the man and when we got about 75 feet he turned with his face towards us. We were still on the crossover, and I saw him turn his face towards me; he was still stooping over; in a stooping position, away from the track, with his head towards the track, and he turned to the right; turned to the right in that stooping position. He was bent over like this (illustrating) with his back in a horizontal position, the top of his back. His head was towards the track, the crossover. From the first I saw him, when he was 100 feet away, up to the time that I saw him when we were 75 feet away, I don't know whether he had changed his position in any other way than change his body. I did not see this man have any tools in his hand. I watched him, and when he turned his head towards— his face towards us, I presumed that this man saw us coming. Then he moved over towards the track when we were about 30 feet from him. I don't know whether he at any time got on that tie No. 4. When we were 30 feet away from him I grabbed for the whistle cord and hollered at the engineer at the same time. Q. Was it 30 feet from where you were sitting, or 30 feet from the cow catcher of the engine? Q. (By the Court): How far was it from where you were sitting? A. About 30 feet. From the cow catcher to where I was sitting I would say is about 18 feet. Q. (By the Court): When you saw him as you were sitting in that position, the front of the engine was about 12 feet from him, is that right? A. Yes, sir. That is the time I grabbed for the cord and missed it. I missed it. When you pull the cord it opens the whistle, the valve to the whistle, and steam rushes through and blows. · The whistle didn't blow. They struck the man right away. Q. (By the Court) : Then he struck him, that is all there is to it. Before you could reach again to blow the whistle, you struck him? A. Yes. I did not see the

man when he was struck. . . . The view was cut off when I reached for the whistle cord.'' The witness further testified that after the man was hit the train traveled, before it came to a stop, the length of the engine and about half the length of the combination car, the nearest car to the engine; that the length of the engine from the cow catcher to the rear of the tender is about 45 feet and the length of the combination car about 45 feet; that immediately after the witness hollered the engineer applied the brakes; that the train was then about 30 feet away from the deceased; that just before the accident the engine was curving to the left and because of that fact the engineer, whose place is on the right side of the locomotive was unable to see the place where the deceased stood. Upon cross-examination the witness stated that when he first saw the deceased ''he was about four feet away from the nearest rail of the track on which our engine was operating. If he had stayed in that position our train could not have hit him; he would not be hit. So that, to use what a railroad man would call it, he was in the clear at that time. When we then had approached so that our train was, or our engine was, 30 feet from the man, he took a step forward toward the track we were on, and then was not in the clear for the first time. Then I grabbed for the whistle cord.''

It is undisputed that at the point where the deceased was struck there is a space of 10 feet or more between the crossover track and the next track, and that there was nothing to obstruct the view of the approaching train. After the accident tools were found near the ties upon which the crossover rested and in the clearance space between the crossover and the next track. The Viking left the depot on time and reached the place of the accident at the same time that it passed that point daily. Plaintiff's witness Capparelli, who was the section foreman, testified that it was the cus-

tom of enginemen, in the yard, "to blow a whistle in an emergency, what I mean is, if the man on the engine thinks that the man working on the track does not know that the train is coming, and the engine is pretty close to him, he will then blow his whistle; in those circumstances he will blow his whistle to warn the men, and that is when the engine is very close to the men. Men who are not working in a gang, a signalman that is working all over the yard at different places, and doing little jobs and then moving to another, a track walker doing what I described yesterday, they keep working until the train is right close to them and then step off and let the train go by. And it is only when the engineman thinks that he doesn't know the train is coming, and the train is very close to him, that he will blow his whistle."

As stated in *Chicago, M. & St. P. Ry. Co. v. Coogan,* 271 U. S. 472, 474: "The rights and obligations of the petitioner depend upon that Act (the Federal Employers' Liability Act) and applicable principles of common law as interpreted by the federal courts."

· The defendant has assigned and argued a number of points, but in the view that we have taken of this appeal it is necessary for us to consider only one. The defendant contends that "there is no evidence in the record legally tending to prove that negligence on the part of the defendant or any of its other employes was the proximate cause of the death of plaintiff's intestate," and that "negligence on the part of plaintiff's intestate was the sole proximate cause of his injury and death." In support of its contention, the defendant cites, among other cases, *Aerkfetz v. Humphreys,* 145 U. S. 418; *Toledo, St. L. & W. R. Co. v. Allen,* 276 U. S. 165; *Rosney v. Erie R. Co.,* 135 Fed. 311, 315; *Connelley v. Pennsylvania R. Co.,* 201 Fed. 54. In *Aerkfetz v. Humphreys, supra,* the "plaintiff was in the employ of the defendants in the yard of the rail-

road company, . . . working on one of the tracks therein, and, while so engaged, was run over and injured by a freight car, moved by a switch engine. . . . In it (the yard) were 12 tracks and side-tracks, and the yard was used for the making up of trains. A switch engine was employed therein, and, as might be expected, was constantly moving forwards and backwards, changing cars and making up trains. Plaintiff was a repairer of tracks. He had been employed there about 18 months, and was familiar with the manner in which the work was done. The yard was about a quarter of a mile in length. The tracks were in a direct line east and west, with nothing to obstruct the view in either direction." In its opinion the court said (p. 420): "There could have been no thought or expectation on the part of the engineer, or of any other employe, that he, thus at work in a place of danger, would pay no attention to his own safety. Under such circumstances, what negligence can be attributed to the parties in control of the train or the management of the yard? They could not have moved the cars at any slower rate of speed. They were not bound to assume that any employe, familiar with the manner of doing business, would be wholly indifferent to the going and coming of the cars. There were no strangers whose presence was to be guarded against. The ringing of bells and the sounding of whistles on trains going and coming, and switch engines moving forwards and backwards, would have simply tended to confusion. The person in direct charge had a right to act on the belief that the various employes in the yard, familiar with the continuously recurring movement of the cars, would take reasonable precaution against their approach." In *Toledo, St. L. & W. R. Co. v. Allen, supra,* the United States Supreme Court reversed a judgment of the State court because it did

not follow the rule laid down in *Aerkfetz v. Humphreys, supra.* In its opinion the court said (p. 171): "The decision on this point is contrary to the rule followed in the Federal courts. *Aerkfetz v. Humphreys,* 145 U. S. 418, was a case presenting a situation similar to that here involved. It is there said (p. 420): 'The ringing of bells and the sounding of whistles on trains going and coming, and switch engines moving forwards and backwards, would have simply tended to confusion.' And see *Rosney v. Erie R. Co.,* 135 Fed. 311, 315; *Connelley v. Pennsylvania R. Co.,* 201 Fed. 54, 57. . . . The members of the switching crew had a right to believe that he would keep out of the way of the shunted car. *Aerkfetz v. Humphreys, supra.*" In *Connelley v. Pennsylvania R. Co., supra,* plaintiff's intestate was a track walker and the plaintiff charged that the man in charge of the engine in question was negligent (1) in the operation of the train and (2) in failing to give proper warning of the approach of the train, which are the same charges of negligence as are alleged in the two counts in the instant case upon which the case went to the jury. The plaintiff had a verdict and judgment in the *Connelley* case and the Circuit Court of Appeals, in passing upon the question as to whether the facts indicated the negligence charged, held that they did not. The court said (p. 55): "The proofs showed that there are eight or nine tracks between these two stations, that there are numerous crossovers and frogs, and the system widens into 16 tracks running into Broad Street Station. Over these tracks there is the constant passage of several hundred trains incident to such a station. The employment of the deceased was to continuously walk over and watch these tracks, and repair any small job, such as tightening bolts, etc." The court quotes with approval from the *Aerkfetz* case and says (p. 57): " 'Indeed, in thus making self-protection the substantial safeguard of track-walkers and sectionmen, the

law is reasonable and just, for no other dependable safeguard can be afforded their perilous work in the practical operation of railroads.' (Citing many federal and state court decisions, and saying that 'This rule has the uniform support of courts in all sections of the country.')'' The court further says: ''Finding, as we do, no lack of care or omission of duty on the part of the railroad, we are constrained to reverse this case,'' etc. The defendant also cites the aforesaid cases in support of its argument that the death of the decedent resulted from hazards the risk of which he had assumed as a matter of law.

In support of its contention that it made out a prima facie case the plaintiff cites *New York, N. H. & H. R. Co. v. Pascucci*, 46 F. (2d) 969. In that case the plaintiff, in the course of his duties as a laborer and repair worker on defendant's tracks, was passing through a smoke-filled tunnel as dark as midnight when defendant ran a ''draft'' of cars into the tunnel without any warning whatever and without slackening speed, and plaintiff was injured before he could see the cars or get out of the way of the same. The court said: ''To back a train without warning even in a yard into a smoke-filled tunnel at such a rate of speed where workmen passing through might be caught, the jury may have found was a violation of a duty the defendant owed to these men, and that it was not unreasonable to require it either to slacken the speed of a 'draft' under such circumstances, or provide the men on the rear platform with some means of giving warning to men who might, without their fault, be caught like 'rats in a trap.' . . . As the court said in *Central R. R. of N. J. v. Sharkey*, 259 F. 144, 149: The doctrine stated in *Aerkfetz v. Humphreys, supra,* 'is to be understood in the light of the circumstances of that case. . . . But we do not understand that the court meant to lay down the doctrine that under no circumstances could it be negligence if an engine in

a railroad yard failed to blow its whistle or ring its bell.' . . . In other words, circumstances may arise under which a railroad is required to take some precautions to protect workmen in its yards.'' The plaintiff also cites *Baltimore & O. R. Co. v. Robertson,* 300 Fed. 314, wherein a patrolman working on a trestle at night during a labor strike was struck by a train and injured. It appeared that during the period of employment of the plaintiff the defendant,''knowing of his necessary presence on such bridge in a place of danger from passing trains, had adopted the customary practice of warning him of the approach of trains by causing the locomotives drawing such trains to whistle just before they came into sight from behind a curve (located 450 feet distant from the trestle) which prevented plaintiff from seeing them until they reached that point; that plaintiff knew of such custom, and relied on such whistles as signals to warn him of approaching trains; that on the night in question, while engaged in his duty of patrolling the track of his employer, he approached this trestle (which was 286 feet long) and before going upon it stopped, looked and listened, but neither saw nor heard any train; that he thereupon proceeded across the bridge in the direction of the curve, walking necessarily in the center of the single track thereon, which occupied nearly its entire width; that when he had gone about two-thirds of the way across he suddenly saw a train, whose engine had not whistled, coming around the curve toward him; that he then ran on toward the curve and approaching train in an attempt to escape from his dangerous position, and nearly succeeded in reaching a place of safety, but that as he left the track near the end of the trestle his foot was caught and became wedged between the outer guard rail and a spike projecting upwardly from the tie, between the guard rail and the steel rail, to a height greater than

necessary or usual in bridge construction, and before he could extricate himself he was struck by the train and severely injured; that he was unaware of the presence of such spike, whose upward projection was dangerous, and contrary to standard construction practice.'' The court held that under the circumstances of that case the question of defendant's negligence was properly submitted to the jury and that the jury had a right to find as a fact that the defendant was guilty of negligence. The plaintiff also cites *Voorhees v. Central R. Co. of New Jersey,* 14 F. (2d) 899, which is a decision of the Circuit Court of Appeals, Third Circuit. In its opinion the court said: ''Voorhees was employed by the defendant as 'a section man at Whitehouse Station, N. J., under a foreman, . . . and his duties were to keep the ashes off tracks 3 and 4, provide a dump for them, and clean up around the water plug, and so forth.' He was working at what is known as No. 1 water column, called a water plug or standpipe. This is about one mile east of the station. At this point the defendant has four tracks, numbered 1, 2, 3 and 4. The east-bound tracks are numbered 1 and 3, and the west-bound tracks 2 and 4. No. 1 is a through east-bound track, and No. 2 is a through west-bound track. The deceased was killed by a wrecking train on track No. 3 on its way from Whitehouse Station to County Line, a mile or two away, 'to pick up a couple of cars.' This track is the most southerly one, and the standpipe is located between it and track No. 1, which is the track next to it on the northerly side. The distance between these two tracks at this point is 13 feet 6½ inches. The standpipe is located between these tracks, and rises out of a concrete base 8½ feet long, 6 feet 2 inches wide, and 2 feet 2 inches high. At the top of the base the standpipe is 3 feet in diameter, but is reduced to 1 foot some distance above the base. The record does not

contain a statement of its height, but it is high enough so that water will run from it over the top of the engine tanks, which are about 10 feet above the rails of the track. While the engines are taking in water, engineers remove from them clinkers, and some of them fall on the side of the tracks and behind the base of the standpipe. The deceased had built a fire near the standpipe on the day in question, and was 'cleaning up' around it. . . . He stepped out from behind the water plug or standpipe, and 'had one leg across the rail' on his way across the tracks to the dump, when he was struck and killed. . . . Gainey, a witness produced by the defendant company, was the head brakeman of the wrecking train that killed Voorhees. When the train left Whitehouse Station, he went up into the cab of the engine, and instead of sitting down in a vacant seat on the fireman's side of the cab, or standing at or near the side of the engineer, he seems to have stood directly back of the engineer, who turned around and was looking at him at the time of the accident, or directly in front of him, thus cutting off his vision, so that he could not see the deceased in front of his engine, and did not know that he had attempted to cross the tracks until Gainey 'hollered.' . . . If the engineer had seen him, he said that he would have blown the whistle, and the deceased could have stopped before going on the track; but he did not see him, and did not give any warning of the approach of the train. Whether Gainey was standing in front of the engineer and obstructed his view, or in the rear and the engineer had turned around and was looking at him, and not in the direction in which he was going, are clearly questions of fact for the determination of the jury, on which it might have concluded that the railroad company was negligent. The learned trial judge could not have directed a verdict for the defendant, except upon the hypothesis that he

had found the facts and concluded from his findings that the defendant was not guilty of negligence. Under the evidence in this case, he could not thus usurp the function of the jury and determine the facts.'' From a reading of the entire opinion it is apparent that the court did not intend to run counter to the rule laid down by the Federal Supreme Court in the *Aerkfetz* case, nor would it have had the right to do so.

After a very careful consideration of the aforesaid authorities cited by the plaintiff we have reached the conclusion that they do not apply to the facts of the instant case. To sustain its argument that they do apply, the plaintiff is obliged to assume a state of facts entirely unwarranted by the evidence. It argues that the jury were not obliged to believe the testimony of its witness Saska that the deceased saw the approaching train and was in a position of safety until the train was within a few feet of him and that he then unexpectedly stepped into a position of danger, and that the jury were warranted in finding that the deceased, at the time in question, ''was stooping over, with his back horizontal, and was at work'' on the track, and ''that during all the time deceased was observed by the fireman, he was in a place of danger, and that the fireman was negligent in failing to blow the whistle, so as to give him adequate warning of the train's approach. The train traveled the 100 feet in four and one-half seconds. The facts conclusively show that deceased was oblivious of the approach of the train, and . . . the jury was justified in finding that the fireman was negligent in failing to blow the whistle when he had an opportunity to do so, after observing deceased at work in front of the train.'' This theory of fact of the plaintiff is not supported by the testimony of Saska, nor by any other evidence. The plaintiff, in, what seems to us, a desperate attempt to

bring its case within the rule laid down in the cases cited by it, is compelled to entirely discredit its own witness upon the main points of his testimony, and while the plaintiff, in the trial, relied upon Saska to make out a prima facie case, it now asks us to eliminate the important and controlling parts of his testimony and to assume a state of facts not warranted by the evidence. We feel impelled to say that we do not concur in the present position of the plaintiff that the witness Saska testified falsely as to the main points of his testimony. We find nothing in his testimony that would warrant a reasonable belief that he was not telling the truth, nor is there anything in the record that impeaches him upon any material matter. Saska was the only person who saw the accident, and had he been trying to aid the defendant, as the plaintiff argues, he could have testified that he blew the whistle as he approached the place in question. According to Saska the deceased moved towards the track, and to a point of danger, when the train was practically upon him, and had Saska at that moment blown the whistle it would not have prevented the accident. After giving very careful consideration to the important question involved in the instant contention, we have reached the conclusion that under the undisputed evidence in the case and the federal law that governs our decision, the record is barren of evidence tending to prove negligence on the part of the defendant, and that therefore the plaintiff failed to make out a prima facie case. Under such a state of the record, it was the duty of the trial court to grant defendant's motions, duly made, to direct a verdict in its favor. See *Gulf, M. & N. R. Co. v. Wells*, 275 U. S. 455, wherein the court said (p. 457): " . . . the case is controlled by the Federal Employers' Liability Act. Hence, if it appears from the record that under the applicable principles of law as interpreted by the Fed-

eral courts, the evidence was not sufficient, in kind or amount, to warrant a finding that the negligence of the engineer was the cause of the injury, the judgment must be reversed.''

Holding, as we do, that under the undisputed evidence the defendant was not guilty of negligence as charged in the first or second count of the declaration, the judgment of the superior court of Cook county must be reversed and it is so ordered.

*Reversed.*

KERNER, P. J., and GRIDLEY, J., concur.